# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 4, 2014 Session

## STATE OF TENNESSEE v. JERMAINE DAVIS

**Appeal from the Criminal Court for Shelby County**
**No. 10-08139      James C. Beasley, Jr., Judge**

---

**No. W2013-01123-CCA-R3-CD  -  Filed June 27, 2014**

---

A Shelby County jury convicted the Defendant, Jermaine Davis, of nine counts of aggravated rape, and the trial court ordered him to serve an effective sentence of seventy-five years in the Tennessee Department of Correction.  On appeal, the Defendant contends that: (1) the trial court committed plain error when it included "recklessness" in the definition of aggravated rape in the jury instruction; (2) the trial court committed plain error by failing to instruct the jury on voluntary intoxication; (3) the trial court committed plain error by failing to compel the State to elect facts to support three of the counts charged; (4) the evidence is insufficient to sustain his convictions; (5) the trial court erred when it sentenced the Defendant by ordering him to serve twenty-five years for each of the convictions and by imposing partial consecutive sentencing.  After a thorough review of the record and applicable authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Lance Chism, Memphis, Tennessee (on appeal) and Mark Renken, Memphis, Tennessee (at trial) for the appellant, Jermaine Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; Alanda Dwyer and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from allegations that the Defendant raped two victims, K.H. and C.T.,[1] that occurred on or about April 16 and 17, 2010, while the Defendant was armed with two knives. A Shelby County grand jury indicted the Defendant for eleven counts of aggravated rape.[2]

At the Defendant's trial on these charges, the parties presented the following evidence: Officer Brian Onan testified that he worked for the Memphis Police Department and that he responded to a call in the early morning of April 17, 2010. He testified that the "type of call" he responded to was "a[n] aggravated criminal assault where one victim was out of the home and one victim was still inside the home with the suspect who was armed." He stated that he received the call around 2:30 a.m. and that he responded to the location provided within two to five minutes after receiving the call.

Officer Onan testified that he and another officer, Officer Kevin Frazier, arrived at the location where they found two white females standing beside a Mitsubishi Gallant. He testified to the following:

> [Officer Frazier and I] drove up. [The two women came] directly to the window of the [police] car before we even had a chance to get out and pointed to the direction of an alley, on the backside . . . . Started explaining to us the situation. They were talking to us both at one time where we had to slow them down, very frantic, upset about what was going on. [One woman] started telling me that she had already been raped and had gotten out of the home and [we] had to figure out why the other [woman] was there. She was a friend that had been called by the other [woman], came over there and was telling me that her other friend was still in the home with the armed suspect.

Officer Onan testified that he later identified the woman who came to his car window and said she had been raped as K.H. He stated that when he arrived, K.H. "obviously had been crying, eyes blurry[,]" and that she was talking fast, very upset, and that she was "excited." Officer Onan said the second woman was named "Lacey," and she too was "excited" and upset about the friend who was still inside the home.

Officer Onan testified that K.H. told him that the friend still inside the home was named "Cassandra." At that point the officer began to walk down the alleyway where the

---

[1]To protect their privacy, we will refer to the victims as "the victim" or by their initials only.

[2]The State voluntarily dismissed two counts of the indictment, Counts 10 and 11, at the close of the State's evidence.

women indicated the home was located. Before he could reach the home identified by K.H., the second victim, C.T., came out of the home. Officer Onan stated that she was crying and saying that she had been assaulted or raped, and he stated that she was carrying her "panties." He stated that she was extremely upset and crying "nonstop the whole time." Officer Onan testified that he and Officer Frazier walked K.H., C.T., and "Lacey" back to his police car as other squad cars started to arrive at the scene. During the walk to his police car, C.T. said she had been "assaulted at knife point" but did not go into more detail at that moment. He stated that the victims named the Defendant as the person who had assaulted and raped them.

Officer Onan testified that, once backup had arrived at the scene and the victims were safe, he and Officer Frazier returned to the residence from which the second victim had exited. Other officers surrounded the home and started announcing a police presence while knocking on the doors and windows. Officer Onan testified that, at some point, the owners of the home had been called, and they arrived at the scene and provided officers with a key to enter the home. He stated that no less than eight officers entered the home with their weapons drawn and yelling "Memphis Police." Once inside, the officers checked and "cleared" each room, until they found one man in the master bedroom. The man was in a bed, under the covers, and pretended to be asleep when the officers approached him. Officer Onan identified the Defendant in the courtroom as the man they found inside the home.

Officer Onan stated that the officers got the Defendant out of the bed, handcuffed him, and walked him out of the house, where he was detained in a police car. Officer Onan recalled that he then interviewed the two victims who were still crying and upset. The victims were transported to the Memphis Rape Crisis Center.

On cross-examination, Officer Onan testified that, when he found the Defendant in the bed inside the house, the Defendant did not say anything but appeared coherent.

K.H. testified that in April 2010 she was working at Circle K. She stated that she had met C.T. through a friend named Lacey. K.H. stated that she "knew of" the Defendant, whom she identified in court, because he had come to the Circle K a couple of times with Lacey. She recalled that, on the night of April 16, 2010, while she was at Circle K, Lacey and the Defendant called her cellular telephone to ask her to give the Defendant a ride to "Sycamore View." She stated that the Defendant was going to give her fifteen dollars worth of gas money in exchange for a ride.

K.H. testified that she and C.T. had plans to "chill" that night, and C.T. arrived at Circle K soon after the Defendant requested a ride from K.H. K.H. testified that she asked C.T., who also knew the Defendant through Lacey, if she wanted to ride with her to take the Defendant to Sycamore View.

K.H. testified that she and C.T. left Circle K to pick up the Defendant at his mother's house, and they found him standing outside on a corner near his mother's house when they arrived. She testified that she was driving a Mitsubishi Gallant, with C.T. in the passenger seat, and the Defendant got in the backseat. On the way to Sycamore View, the Defendant told the two victims that he needed to go to Waffle House instead of Sycamore View, and the victims agreed to take him there. At Waffle House, the Defendant got out of the car and said he was meeting up with someone there. He told the victims he would be back with the fifteen dollars for gas money, but the victims did not wait in the car very long for the Defendant to come back. K.H. said when they realized he was not coming back, she and C.T. drove away in the direction of C.T.'s home.

K.H. testified that the Defendant called her back on her cellular telephone and asked the victims to meet him at a gas station across the street from the Waffle House, so they turned the car around to meet him, in the hopes of getting the fifteen dollars he owed to K.H. At the gas station, the victims waited for the Defendant and called his cellular telephone. When he did not meet them or answer his telephone, the victim decided to leave and "not worry" about the fifteen dollars. After they drove away from the gas station, the Defendant called again and told the victims to meet him at a home in C.T.'s neighborhood. The home was "right on the way" to where C.T. lived, so they agreed to meet the Defendant there. K.H. stated that the Defendant said he would give her the fifteen dollars.

K.H. testified that, once she and C.T. arrived at the home, the Defendant told them that they could "come in to chill, [and] chat," which they did. The Defendant said the fifteen dollars was inside the home. Once inside, K.H. and C.T. stood in the kitchen, while the Defendant left the room. At that point, the two victims noticed, based on the items taped to the refrigerator, that it was not the Defendant's home, and they became uncomfortable. When the Defendant returned to the kitchen, he told the victims that they could go into the bedroom and sit down, and they did so. The Defendant then left the bedroom for a "couple" minutes and when he returned he asked the victims if they wanted to make $100 and watch him masturbate. K.H. testified that, at this point, she knew that she and C.T. should leave. They responded "no" to the Defendant's request and "started heading for the door." The Defendant was in front of the victims, and he suddenly turned around and "had knives in his hand." K.H. agreed that the Defendant seemed "aggressive," and she was frightened. She stated that the victims followed the Defendant's instructions so they would not get hurt.

K.H. testified that the Defendant, while still holding the knives, told the victims to remove their shirts. He then instructed K.H. to kiss him and C.T. to perform oral sex on him. She agreed that she saw the Defendant put his penis in C.T.'s mouth. The two victims and the Defendant went into the bedroom, and K.H. sat in a chair. The Defendant told K.H. to remove her clothes, which she did. The Defendant, with the knives in his hand, told K.H.

to get on the bed and perform oral sex on him. K.H. stated that he forced her to put his penis in her mouth. K.H. recalled that she "felt like [she] knew what was coming[,]" and so she asked the Defendant to use a condom for protection, to which he replied "No." K.H. said "something" in response, causing the Defendant to slap her "hard" across the face. The slap caused her ears to start ringing and her glasses to fly off her face and onto the floor. She recalled that the lights in the bedroom were on.

K.H. testified that, after the Defendant slapped her, he told C.T. to get on the bed and perform oral sex on him. K.H. did not know whether C.T. actually did because she looked away. The Defendant then told both victims to "get on all fours on the bed[] [and] stick [their] butts out." They complied, and then, while both women faced the wall and the Defendant stood behind them, he penetrated K.H. vaginally and anally with his penis. K.H. did not know if he did the same to C.T. The Defendant then told C.T. to lay on the bed and told K.H. to perform oral sex on her. C.T. "laid back [on the bed] with her knees up" and K.H. laid down in between C.T.'s legs with the Defendant behind K.H.. While he was behind her, the Defendant again penetrated K.H. vaginally and anally and told her to "eat [] out" C.T. K.H. stated that she laid her head on C.T.'s stomach to give the Defendant the "impression" that she was performing oral sex on C.T. K.H. stated that, while she could not see what the Defendant was doing behind her nor could she see the knives, she could feel what he was doing and "something metal" in her back, which she assumed were the knives. The Defendant then told the victims to "switch around" with K.H. on her back on the bed and C.T. laying on top of her. K.H. closed her eyes and did not see whether the Defendant penetrated C.T.

K.H. testified that she asked the Defendant if she could go get some "weed" from her car. K.H. stated that she did not, in fact, have any "weed" in her car but that she thought the idea might appeal to the Defendant because he had earlier smoked a pipe, which she assumed contained drugs. K.H. stated that she was never in a position to get to her cellular telephone safely in order to make a call for help and that she feared she would die if she tried to get her telephone. K.H. stated that the Defendant agreed to let her get marijuana from her car but would not allow C.T. to leave. He escorted K.H. to the door and let her out of the home. K.H. stated that "as soon as [she] got in [her] car [she] turned that engine and [she] was gone." K.H. then called 911 and Lacey, because K.H. knew she was close by. Lacey arrived first and then the police, and K.H. told them she had been raped.

K.H. stated that when the police arrived they wanted to know where the home was, so K.H. took the officers to look for the home down an alleyway. They found C.T. walking down the alleyway. K.H. described C.T. as being "a mess" and carrying K.H.'s shoes and underwear with tears "falling out of her eyes." K.H. stated that, twenty to thirty minutes later, the Defendant was brought out of the home.

K.H. testified that she left the scene with the police and went to the sexual assault center where a rape kit was performed. She then went to the police precinct to give a statement. K.H. recalled that she signed her statement on April 17 at 3 p.m.

K.H. recalled that the Defendant ejaculated in her mouth but did not know if he had ejaculated in her vagina or anywhere else.

A recording of K.H.'s call to 911 was entered into the record as evidence and played for the jury. On the recording, K.H. can be heard crying hysterically, telling the dispatcher that the Defendant lured her and C.T. into a residence and forced them to undress and "do stuff." She is sobbing as she tells the dispatcher that C.T. is still inside the house with the Defendant, who is using kitchen knives as weapons and that she fears C.T. is going to get hurt.

On cross-examination, K.H. reiterated that the Defendant was smoking from a "pipe," but she did not recognize the smell and stated that it was not marijuana. She recalled seeing him smoke the pipe one time while he and the two victims were in the bedroom. She agreed that he took a short "pull" from the pipe, lasting one or two seconds. K.H. agreed that both she and C.T. "faked" performing oral sex on each other.

K.H. clarified that the Defendant made C.T. perform oral sex on him in the hallway, and made K.H. perform oral sex on him in the bedroom. She agreed that both victims put their hands and knees on top of the bed when the Defendant made them get "on all fours." K.H. stated that the Defendant took his clothes off at some point, but she did not see him do so.

C.T. testified that she was nineteen years old on the night of April 16, 2010, and that she was working at Comprehensive Pharmacy Services at the time. She testified that she met K.H. at a gas station through her friend Lacey in 2009 and that she had met the Defendant once through Lacey. C.T. stated that on April 16 she went on a date at TGI Fridays, and her date dropped her off at Circle K to meet K.H. after dinner. C.T. recalled that K.H. had asked her to meet at Circle K to give the Defendant a ride and "drop him off somewhere for gas money." C.T. clarified that her date was originally going to drop her off at home, but her plans changed when K.H. asked her to meet.

C.T. testified that, once she arrived at Circle K, she, her date, and K.H. talked in the parking lot for ten minutes and then she left with K.H. to pick up the Defendant. She was "pretty sure [they] were supposed to pick [the Defendant] up from his house," but instead they picked him up on the corner. C.T. agreed that K.H. was driving, she was in the

passenger's seat, and the Defendant was in the backseat. C.T. identified the Defendant in the courtroom as the man they picked up.

C.T. testified that they drove the Defendant to Waffle House where he got out. The victims waited in the parking lot for the Defendant to come back out, but, when he did not, they drove away. C.T. agreed that she discussed with K.H. whether the Defendant would pay the money he had promised. After driving away, K.H. called the Defendant about her money, and he told the victims to meet him at a gas station. When he failed to show up at the gas station, the victims again drove away to go to C.T.'s home. The Defendant called K.H. back and said he had "made it to the house [where] he had left his wallet[.]" C.T. recalled that the home was on Barbie Street, and, because it was on the way to her home, the victims decided to meet the Defendant there to get the money he owed K.H.

C.T. stated that the victims had trouble finding the home and drove down an alleyway where they found the Defendant. He directed them to the home and said the money was inside. C.T. said the Defendant invited them inside and they did not think "anything weird" about his invitation. C.T. recalled that they went inside to the kitchen through a door in the garage, and the Defendant offered them two chairs at the back of the home. She recalled that the Defendant then came in the room and offered the victims one hundred dollars to watch him masturbate, and C.T. said, "I think it's time to go." As the victims walked toward the door, the Defendant got in front of them and grabbed two knives out of the kitchen. She described the knives as "long with a black handle." While the victim stood in the hallway, the Defendant continued to hold the knives and told them to remove their shirts. C.T. said she could not see a way to escape and that she did not try to run out of the home because she was scared.

C.T. testified that, after the Defendant ordered the victims to remove their shirts, he told K.H. to kiss him and told C.T. to perform oral sex on him while the three were in the hallway. C.T. stated that she got on her knees and performed oral sex on the Defendant and that his penis went inside her mouth. With the knives still in his hand, the Defendant then took the victims to a bedroom. She recalled that K.H. went into the bedroom first and sat on the bed, and C.T. sat in a chair. C.T. tried to pull two cellular telephones out of her pockets to make a call for help, but "before [she] had gotten a chance, [the Defendant] had paid attention to [her] and was telling [her] to take [her] clothes off," so she dropped the telephones to the floor. The Defendant took both telephones after she dropped them, and she did not regain access to her telephones after that. C.T. recalled that, when the Defendant told her to take her clothes off, K.H. was performing oral sex on the Defendant on the bed. C.T. said she heard the Defendant "smack [K.H.] across the face," so C.T. looked up and saw that K.H.'s glasses had flown off her face. C.T. recalled that the lights in the bedroom were on.

C.T. recalled that, after the Defendant smacked K.H., he told C.T. to take off her clothes and get on the bed. The Defendant held both knives in his hand and ordered C.T. to perform oral sex on him. He then ordered C.T. to perform oral sex on K.H. while he penetrated C.T. both vaginally and anally. While the Defendant was raping her from behind, C.T. could feel the handle of the knives on her. C.T. recalled that the Defendant made the victims "swap" positions, with K.H. performing oral sex on C.T., and the Defendant raping K.H. from behind. C.T. recalled that K.H. asked to get a condom, and the Defendant said, "No," but at some point he let "someone" go to the car. C.T. said that K.H. went to the car because, C.T. assumed, K.H. still had her telephone. C.T. recalled that K.H. asked to go to the car multiple times and "probably by the second or third time" the Defendant allowed her to go.

C.T. testified that the Defendant escorted K.H. out of the house and locked the door behind her as she left. The Defendant returned to the bedroom and told C.T. that K.H. was gone and that he had locked the door. She recalled that he still had the knives with him. After K.H. left, C.T. observed the Defendant smoking out of a pipe, shaped like a tube. She testified that he turned the bedroom lights off, but she could still see. C.T. asked the Defendant if she could use the bathroom down the hallway. The Defendant followed her into the bathroom and forced C.T. to perform oral sex on him while she sat on the toilet. They went out into the hallway after she used the bathroom, and the Defendant forced her to bend over and started penetrating her vaginally. The victim recalled that the Defendant said that if she "wasn't going to do it right, he was going to put five fingers inside of [her]." C.T. stated that they went back into the bedroom, and the Defendant "had [her] bend over and he put his whole fist inside of [her]." C.T. described that as the "worst pain of the whole evening." She also stated that he again penetrated her vaginally with his penis.

C.T. testified that, when the Defendant put his fist inside of her vagina, she "straightened up and turn[ed] around like what are you doing[?]," and the Defendant said he would hit her "like he hit [K.H.]" if she did not stop. C.T. said the Defendant again penetrated her anally after he put his fist inside of her vagina. The Defendant also made her perform oral sex on him again, and he pulled her hair while she did so. C.T. said the Defendant was having trouble getting an erection. She recalled that he was still holding the knives when he told C.T. that he would hit her. She said he also put one of the knives against her arm.

C.T. testified that she asked the Defendant if she could leave to get cleaned up, because she was menstruating, and she would return later. She said that at some point the Defendant started dressing, so she did the same. The Defendant returned her cellular telephones to her, and then he let her out of the house through the garage. When the Defendant opened the garage door for C.T. to "bend under" she saw police outside the home.

-8-

C.T. exited the garage into the alleyway, saw a light, and started crying because she was "scared," "hurting," and "happy to be out." Walking down the alleyway toward the light, C.T. saw Lacey, K.H., and a police officer. She was "hysterical bawling" and in pain from when the Defendant put his fist inside her.

C.T. stated that she left the scene and went to the rape crisis center before giving a statement to police. She recalled being in the back of the police car when the Defendant was brought out of the home by the police.

Officer Kevin Frazier testified that he worked for the Memphis Police Department and was with his partner, Officer Onan, on April 17, 2010. He testified that they responded to a criminal assault call at 2:30 a.m. He stated that it took he and Officer Onan about fifteen minutes to respond to the location. Once they arrived, they were approached by a "frantic" woman who was crying. The woman alleged that she had been raped and her friend was still inside the house being raped as well. He stated that the woman showed them where the house was, but, before they could walk to it, the other friend approached them, also in a frantic state. Officer Frazier stated that they put both women in the squad car and other officers arrived at the scene to help secure the location.

Officer Frazier testified that police officers began beating on the doors and windows of the home where the women indicated the perpetrator was located. He stated that eventually the homeowner arrived to allow officers inside, and an officer brought out an individual from inside.

Sergeant Gerald Paige testified that he worked for the Memphis Police Department and was called to the scene on April 17, 2010, to collect evidence of the crime. He stated that the victims had left the scene when he arrived. He stated that he was taken inside to the back bedroom of the house where the assault had taken place. Sergeant Paige stated that he also searched the rest of the home. He stated that he found two knives on the table in the kitchen. In the bedroom, which he described as being in "disarray," Sergeant Frazier found a mattress on the floor with black satin sheets on it. He stated that he used an "alternative light source" to reveal stains on the sheets not visible to the naked eye. He testified that the alternative light source revealed stains on the sheets and the floor, and he did a DNA sample on those stains. He stated that he cut out a piece of carpet from the floor where the stains were and catalogued it into evidence in addition to the bed sheet.

On cross-examination, Sergeant Paige stated that he could not tell if the stains were recent.

Thomas Shouse testified that he was a criminal investigator with the District Attorney General's office and that he took a DNA sample from the Defendant in the course of his investigation related to this case. He stated that the sample was taken from the Defendant on September 21, 2011, sealed and sent to the Tennessee Bureau of Investigation ("TBI") lab for analysis. Mr. Shouse stated that he took the Defendant's DNA sample, along with the rape kits from the two victims, to the TBI.

Jean Listion testified that she and her husband owned the home where the rapes took place and that they had bought it for their grandson. She testified that she visited the home every day and had been there on April 16. She stated that she had never heard of or met the Defendant before the night of the crime. She stated that in the early morning hours of April 17, she and her husband got a call from the police department telling them that there was a situation at their grandson's home. Ms. Listion stated that she gave the officers a key to the home, and then officers lead a man out of the house. She stated that her grandson was not at his home that night.

Margaret McCallum testified that she was a nurse at the Rape Crisis Center where the two victims were taken on the morning of April 17, 2010. Ms. McCallum was qualified, based on her training and experience, as an expert in the field of forensic nursing. She stated that she conducted a physical examination and performed a rape kit on C.T. at 7:30 a.m. on April 17, 2010, and K.H. at 10:50 a.m. on April 17, 2010.

James Lawrence testified that he was a TBI Special Agent Forensic Scientist. He was qualified as an expert in the fields of serology and DNA forensic analysis. Mr. Lawrence testified that he analyzed the rape kits performed on the victims and the DNA sample taken from the Defendant. His findings were contained in a report dated June 11, 2010, which was admitted into evidence. Mr. Lawrence testified that the vaginal swab taken from C.T. matched the Defendant's DNA sample. He testified that the vaginal swab taken from K.H. was "consistent" with the Defendant's DNA sample. Mr. Lawrence clarified that both victims' vaginal swabs contained matches with the Defendant's DNA, each to a different extent.

Based upon this evidence, the jury found the Defendant guilty of nine counts of aggravated rape. The trial court imposed twenty-five year sentences for each of the nine convictions, and ordered that Counts 2 through 6 and Counts 7 through 9 run consecutively with Count 1, for an effective sentence of seventy-five years at 100% in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court committed plain error when it included "recklessness" in the definition of aggravated rape in the jury instruction; (2) the trial court committed plain error by failing to instruct the jury on voluntary intoxication; (3) the trial court committed plain error by failing to compel an election by the State for three of the counts charged; (4) the evidence is insufficient to sustain his convictions; (5) the trial court erred when it sentenced the Defendant to twenty-five year sentences and when it imposed consecutive sentencing.

## A. Plain Error Review

The Defendant concedes that he failed to object to the trial court's jury instructions and failed to request that the State be required to make an election of offenses. Thus, he concedes that our review of his first three issues is for plain error.

In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived . . . ." Tenn. R. App. P. 3(e); *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010); *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). This Court may, however, review an issue which would ordinarily be considered waived if the Court finds plain error in the record. *See* Tenn. R. App. P. 36(b). The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b).

This Court will grant plain error review only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'" *Hatcher*, 310 S.W.3d at 808 (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994))). "If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* (citation omitted). We need not consider all five factors when the record clearly establishes that at least one of the factors is not met. *Hatcher*, 310 S.W.3d at 808. It is the defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010).

-11-

## 1. Jury Instruction
### a. "Recklessness" Instruction

The Defendant contends the trial court erred when it instructed the jury by including the mental state of "recklessness" in the definition of aggravated rape. He concedes our review is limited to plain error review. He also concedes that there is case law in this jurisdiction that specifically concludes that "recklessness" is an appropriate mental state for aggravated rape. He asserts, however, that he is entitled to plain error relief because the trial court's jury instruction "lowered the State's burden of proof," violating a clear and unequivocal rule of law. The State responds that "recklessness" is a permissible instruction for the mental state required to prove aggravated rape, and, as such, the Defendant has not shown that the trial court violated a clear rule of law, preventing him from establishing the five prerequisites warranting plain error review.

Because each element of our plain error review must be met, we turn first to address whether a clear and unequivocal rule of law was breached. As the Defendant concedes, there is case law that holds that an instruction of "recklessness" is properly included in the jury instruction for aggravated rape. *State v. Hood*, 221 S.W.3d 531, 546 (Tenn. Crim. App. 2006); *State v. Bowles*, 52 S.W.3d 69, 75-76 (Tenn. 2001); *State v. Hill*, 954 S.W.2d 725, 726 (Tenn. 1997); *State v. Jones*, 889 S.W.2d 225, 229 (Tenn. Crim. App. 1994). As such, the trial court did not violate a "clear and unequivocal rule of law" when it instructed the jury on "recklessness" as a mental state for aggravated rape. The Defendant has not established one of the prerequisites for plain error review, and thus, is not entitled to relief.

### b. "Voluntary Intoxication" Instruction

The Defendant next contends that the trial court erred by failing to include voluntary intoxication as a mental state. The State responds that, as there was no proof presented of the Defendant's level of intoxication, it was not error for the trial court to not include an instruction on voluntary intoxication in its jury instructions. We agree with the State.

Again, because each element of our plain error review must be met, we turn first to address whether a clear and unequivocal rule of law was breached. Voluntary intoxication is not in itself a defense to prosecution, but it "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a)(2010). In *Harrell v. State*, 593 S.W.2d 664 (Tenn. Crim. App. 1979), this Court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle the accused to jury instructions . . .;

-12-

there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

*Id.* at 672 (citations omitted). The burden lies with the defendant to establish sufficient proof that he was intoxicated to warrant a jury instruction on voluntary intoxication. *Hicks v. State*, 533 S.W.2d 330, 331-32 (Tenn. Crim. App. 1975).

Here, the Defendant did not request a jury instruction on voluntary intoxication, nor did he object to the omission of the same when the jury instruction was given. Furthermore, the Defendant did not present sufficient proof to meet his required burden that he was intoxicated such that he lacked the capacity to form the mental state required for aggravated rape. Accordingly, the Defendant was not entitled to a jury instruction for voluntary intoxication, and thus, plain error review is not warranted. The Defendant is not entitled to relief on this issue.

## 2. Election of Offenses

The Defendant next contends that the trial court erred when it did not compel the State to elect facts to support Counts 7, 8, and 9 of the indictment. The Defendant concedes that he failed to request for an election during the trial, but he alleges that he is entitled to relief pursuant to plain error review. The State responds that the Defendant has failed to establish all five of the plain error factors, and, furthermore, the need for election never arose because the trial court's instruction to the jury made it clear which sexual acts were being relied upon for the charged offenses. We agree with the State.

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim that allegedly occurred during that span of time. *State v. Rickman*, 876 S.W.2d 824, 828-829 (Tenn. 1994). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. *See Burlison v. State*, 501 S.W.2d 801, 803 (Tenn. 1973); *see also State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001). This requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999).

The Supreme Court has noted, in consideration of this issue, that a defendant's right under our state constitution to a unanimous jury verdict is the most serious concern. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). Moreover, because the election requirement is "fundamental, immediately touching the constitutional rights of an accused," a trial court has a duty even absent a request by the defendant to ensure the timely election of offenses by the State and to properly instruct the jury concerning the requirement of a unanimous verdict. *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Specifically, "it [is] the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." *Burlison*, 501 S.W.2d at 804.

During closing arguments in this case, the State, relative to Counts 7, 8, and 9, made the following statements:

> Count 7 is [the Defendant] sexually penetrated [C.T.] by anal intercourse in the bedroom . . . after [K.H.] had left.

> Count 8 is [the Defendant] sexually penetrated [C.T.] by vaginal sexual intercourse at [the home] after [K.H.] was allowed to leave and snuck out [of the house].

> Count 9, that [the Defendant] forced [C.T.] to fellatio again oral sex, after [K.H.] had left.

The trial court instructed the jury that:

> Count seven deals with the sexual penetration of [C.T.] by anal intercourse in a bedroom of 1639 Barbie after [K.H.] had left the premises. Your verdict choices for that count would be: We, the jury, find the [D]efendant guilty of aggravated rape, aggravated sexual battery, rape, or sexual battery; or we, the jury, find that [D]efendant not guilty of count seven.

> Count eight deals with the sexual penetration of [C.T.] by vaginal sexual intercourse in a bedroom of 1639 Barbie after [K.H.] had left the premises. Again, your verdict choices for that count would be: We, the jury, find the [D]efendant guilty of aggravated rape, aggravated sexual battery, rape,

-14-

or sexual battery; or we, the jury, find that [D]efendant not guilty of count eight.

Count nine deals with the sexual penetration of [C.T.] by fellatio in a bedroom of 1639 Barbie after [K.H.] had left the premises. Again, your verdict choices for that count would be: We, the jury, find the [D]efendant guilty of aggravated rape, aggravated sexual battery, rape, or sexual battery; or we, the jury, find that [D]efendant not guilty of count nine.

The trial court also instructed the jury that "the verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous."

Thus, although the State failed to specifically elect the offenses for Counts 7, 8, and 9 in its closing argument, the trial court properly instructed the jury as to when and where the offenses occurred in the course of the events sufficient to inform the jury as to which offense was elected for each count. The evidence was that the Defendant, on three distinct occasions, anally raped and vaginally raped C.T., as well as forced C.T. to perform fellatio on him, in the bedroom of the house after K.H. had left. The trial court properly instructed the jury as to each of the three counts that those acts were performed in the bedroom after K.H. had departed. Thus, we conclude that unanimity was ensured by the trial court's instructions, and the Defendant has not shown that "substantial justice" is at stake so as to warrant plain error review. The Defendant is not entitled to relief.

## B. Sufficiency of the Evidence

The Defendant next contends that the proof was insufficient to sustain his convictions for aggravated rape. He contends that no reasonable jury could have accredited the victims' testimony, given their "numerous" inconsistencies. He further contends that the State failed to present any evidence sufficient to support Count 3 of the indictment, because "[C.T.] never testified that she performed oral sex on the Defendant in the bedroom while in the presence of [K.H.]." The State responds that questions of a victim's credibility regarding inconsistent testimony are questions for the jury, and that the evidence was legally sufficient to support the jury's guilty verdict for Count 3, because K.H. testified that she heard the Defendant order C.T. to perform oral sex on him, which was sufficient evidence for the jury to return a verdict of guilt. We agree with the State.

-15-

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of nine counts of aggravated rape. A conviction for aggravated rape requires proof beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim and either did so through force and coercion, caused bodily injury, or was aided or abetted by another person and used force or coercion. *See* T.C.A. § 39-13-502. "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501.

The Defendant contends that the inconsistencies in the victims' testimony necessitated that "no reasonable jury" could have accredited their testimony. We reiterate that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case. *Bland*, 958 S.W.2d at 659. In this case, by its verdict, the jury accredited the victims' testimony and resolved any inconsistencies in favor of the State's theory that the Defendant committed the offenses for which he was convicted.

The Defendant further contends that the evidence is insufficient to sustain his conviction for Count 3. The trial court gave the following instruction relative to the facts alleged in Count 3:

> Count three deals with the sexual penetration of [C.T.] by fellatio in a bedroom of 1639 Barbie in the presence of [K.H.].

K.H. testified that, while in the bedroom, she heard the Defendant order C.T. to perform oral sex on him. K.H. stated that the Defendant had knocked her glasses off her face, so she was unable to say for a fact whether C.T. had actually performed oral sex on the Defendant. The State concedes that, while the evidence supporting Count 3 is "not as overwhelming as the proof supporting the other counts, the evidence is legally sufficient to support the jury's verdict." We agree that, based upon this evidence viewed in the light most favorable to the State, a reasonable jury could have accredited this testimony and inferred that the Defendant forced C.T. to perform oral sex on him in the bedroom. We are not permitted to substitute our own inference for the inferences drawn by the trier-of-fact from this evidence, *Liackas*, 286 S.W.2d at 859, and we will not disturb the jury's findings on appeal. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant next contends that the trial court erred when it sentenced him. The Defendant asserts that the trial court improperly considered the principles of sentencing, pursuant to Tennessee Code Annotated section 40-35-210(b) (2012), when it sentenced him to the maximum sentence of twenty-five years for each of his nine convictions. The Defendant further contends that the trial court erred in imposing consecutive sentences. The State counters that the trial court correctly followed sentencing principles and guidelines. The State further contends that the evidence supports the trial court's application of two consecutive sentencing factors, that the Defendant was a dangerous offender and that he had an extensive criminal record, and thus, the trial court did not abuse its direction when it ordered consecutive sentencing.

At the sentencing hearing, the State recounted the facts of the case. The State then offered the pre-sentence report and informed the trial court that it believed that the Defendant, based on his record, was a Range I, standard offender. The State noted that the Defendant had a "lengthy criminal history" of fifteen misdemeanor convictions and six felony convictions. The State also noted the violent nature of the crimes committed in this case, the "terror" experienced by the victims, and that the Defendant employed a weapon during the crimes.

The trial court noted that the Defendant's record indicated that he had a prior Class C felony theft conviction and a prior Class C aggravated burglary conviction. The trial court then sentenced the Defendant, articulating the applicable law and stating that he had made the appropriate considerations under that law. The trial court stated:

. . . I believe that based upon the fact that the State gave notice that it was seeking a range one standard offender that we may be bound by that. But I would note for the record that in my opinion [the Defendant] is a range two multiple offender. But I will find for the purposes of sentencing and based on the notice that he is a range one standard offender.

I have considered the enhancement factors found in 40-35-114 and I do find that the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

I have not counted them, but there are multiple felony convictions. Multiple misdemeanor convictions, both in the State of Tennessee and in the state of Texas over an extended period of time.

And . . . the Court finds that there is an extensive history of criminal convictions and criminal conduct in addition for that necessary to find that he is a range one standard offender.

So I am going to put a great deal of emphasis on his prior criminal convictions . . . and behavior in criminal history.

. . . I am going to use his extensive criminal history as an enhancement factor.

And I am going to find that this offense involved a victim and was committed to gratify the [D]efendant's desire for pleasure or excitement. And I'm going to consider that as an enhancement factor. However, obviously, I'm going to use his extensive criminal history and background as the main factor.

I am going to find that all nine counts that the same enhancement factors apply for those same reasons that I have stated. Those two enhancement factors, obviously his record and his attempt to gratify his own desires for pleasure and excitement, would apply to . . . all nine separate counts in this indictment.

For that reason the Court feels and in considering the sentencing considerations that in this particular case confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. And it is necessary to avoid depreciating the seriousness of this offense. I find this to be an extremely serious offense.

[The Defendant] has been on probation in the past. It's been a long time ago if I read the report correctly. And so he has been given the opportunity to turn his life around many, many years ago unsuccessfully obviously.

. . . .

For purposes of concurrent or consecutive sentences, . . . I do find the [D]efendant is an offender whose record of criminal activity is extensive and I've already stated that.

I also find he is a dangerous offender whose behavior indicates little or no regard [for] human life. And that he had no hesitation about committing this crime in which the risk to human life was high.

And that the circumstances surrounding the commission of this offense are aggravated. I have two girls, young ladies in their, if I remember correctly, twenty, twenty-one years old or early twenties, who are subjected to just a night of terror . . . at the hands of [the Defendant].

And that in my opinion confinement for an extended period of time was necessary to protect society from this [D]efendant's unwillingness to lead a productive life. Now at that point I will say that because of his extensive history of criminal convictions and behavior he has shown an unwillingness to lead a productive life. Continued to use drugs at the time and during the course of this crime.

And that his resort to criminal activity and furtherance of an anti-societal lifestyle culminating in the charges he's facing now.

And finally, that the aggregate length of his sentence is reasonably relate[d] to the offense for which the [D]efendant stands convicted.

In this particular case the crimes . . . [that the Defendant] has been convicted of committing against these two women, the testimony was that they were subjected to oral sex, vaginal sex, anal sex, digitally, with his penis.

The second young lady said he even forcefully stuck his whole hand up inside her vagina and she . . . [said] the pain that was associated with him sticking his fist up inside of her was excruciating.

And I think when you . . . listen to the 911 tape that was played . . ., the sheer terror that the one little girl who got out first, you could hear in her voice . . . what kind of emotional state she was in, I can only imagine the emotional state that the other little girl was in who was left inside. And I think, . . . her thought process is that her friend left and hoping she was going to call the police but, . . . not knowing and she's left inside this house with [the Defendant] who proceeds at that point to just more violently molest her and rape her in a manner that's just hard to describe.

This Court feels that consecutive sentencing is merited, warranted. And that the aggregate length of the sentences reasonably relates to the offense for which this [D]efendant stands convicted. I find that his was an extremely aggravated case. And for that reason the Court is going to find that [the twenty-five year sentence] for Count 1 of the indictment [] should be served consecutive to Counts 2 through 6. Counts 2 through 6 will be served concurrent with each other. And that Counts 7, 8, and 9 will be served concurrently with each other but consecutive to Count 1 and to Count 2 through 6. . . . [F]or a total sentence of seventy-five years at one hundred percent.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

### 1. Sentencing Guidelines

The Defendant asserts that the trial court improperly considered the principles of sentencing when it sentenced him. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

-22-

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210; *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d 699 n.33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

In the case under submission, the trial court found that enhancement factor (1) applied, and the court gave that enhancement factor great weight. *See* T.C.A. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). It found enhancement factor (9) applied after considering that the Defendant employed knives in sight of the victims during the commission of the rapes. *See* T.C.A. § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense").

In sentencing the Defendant to seventy-five years confinement, the trial court noted the violent penetration of one of the victim's vagina with his fist, as well his repeated penetration of both victims, anally, vaginally, and orally. The trial court noted the "terror" in the first victim's voice who escaped and called 911 and the resulting fear that the victim left inside the home must have felt. The trial court also noted the "excruciating" pain

suffered by the victim when the Defendant penetrated her with his fist. Based on this and the Defendant's criminal history, the trial court found that the sentence it was imposing was "necessary to protect society by restraining a defendant who has a long history of criminal conduct." The trial court further concluded that the Defendant's crimes were "extremely aggravated" and the sentence imposed was reasonably related to the seriousness of his offenses.

The evidence supports the trial court's determination that this was an aggravated case of multiple and repeated rapes of two victims over the course of several hours. We agree that the sentence imposed is reasonably related to the crimes committed. The evidence further supports the trial court's application of enhancement factors (1) and (9), as the Defendant has numerous prior misdemeanor and felony convictions, and the testimony was that he raped both victims repeatedly while holding two large kitchen knives in his hands. We conclude that the trial court properly applied both enhancement factors, as well as considered the necessary factors when it determined the Defendant's sentence, particularly the nature and characteristics of the criminal conduct involved. As the enhancement factors applied by the trial court are supported by the evidence, we conclude the trial court properly sentenced the Defendant. He is not entitled to relief on this issue.

## 2. Consecutive Sentencing

The Defendant lastly contends that the trial court erred in imposing partial consecutive sentences. Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

> (2) The defendant is an offender whose record of criminal activity is extensive;

> . . . .

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]

-24-

T.C.A. § 40-35-115(2) and (4). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, – S.W.3rd –, NO. M2011-0032-SC-R11-CD, at *_ (Tenn. Dec. 20, 2013).

In this case, the trial court found, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

The trial court found that section (b)(2) applied based on the fact that the Defendant had an extensive criminal history spanning several decades, to which the trial court gave great weight. The trial court further stated that consecutive sentencing was "necessary to protect society from this [D]efendant," particularly because of the "night of terror" suffered by the victims and the Defendant's repeated oral, vaginal, and anal rape of both victims. The trial court also applied section (b)(4), finding that the Defendant was a "dangerous offender whose behavior indicates little or no regard [for] human life." The evidence supports the trial court's application of these two consecutive sentencing factors, and we conclude that the trial court appropriately found that both factors applied to support its order of partial consecutive sentencing.

We further conclude that the length of the Defendant's sentence is justly deserved in relation to the seriousness of these offenses and is no greater than that deserved for the offenses committed. The trial court did not order that the sentences for all nine convictions

-25-

run consecutively, but instead it ordered that three of the nine sentences run consecutively, for a total of seventy-five years of incarceration. We conclude the trial court did not err by ordering partial consecutive sentencing. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we conclude there exists sufficient evidence to support the Defendant's convictions and that the trial court did not err when it instructed the jury. We further conclude that the trial court did not err when it sentenced the Defendant. As such, the trial court's judgments are affirmed.


_____
ROBERT W. WEDEMEYER, JUDGE